[Crim. No. 11170. In Bank. Apr. 11, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. MARK C. OSUNA and JACK R. GORMAN, Defendants and Appellants.

Mark C. Osuna, in pro. per., Andrew P. Smirnoff and A. Leonard Bjorklund, Jr., under appointments by the Supreme Court, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, Derald E. Granberg and Robert R. Granucci, Deputy Attorneys General, for Plaintiff and Respondent.

TRAYNOR, C. J.—A jury found defendants guilty of the

first degree murder of Mario Ferrari and fixed the penalty for each at death. The trial court denied motions for a new trial and entered judgment on the verdicts. The appeal is automatic. (Pen. Code, § 1239, subd. (b).)

The homicide occurred at the Mission Inn, a restaurant and bar in San Rafael. About 12:40 a.m. on September 6, 1965, Leo Albertoni, a co-owner and the chef of the Mission Inn, left the kitchen to go to his apartment upstairs at the back of the inn. On the way he was knocked down by a blow to the back of his neck. He got to his feet, and two hooded men confronted him with pistols. They tied his hands with wire and told him they wanted the safe opened and would kill him if he did not cooperate.

Albertoni did not remember the combination of the safe but told the robbers that it was written on a paper somewhere on the premises. The robbers searched for the combination in vain, but they found two automatic pistols, a .45 and a .32. Each took a pistol, one commenting, "It's good that we found your guns; we will use these if there is going to be any shooting, then we will throw them away." They also took pillows from a bed to be used as silencers if necessary.

The robbers stayed with Albertoni in his apartment for over two hours waiting for the bar to close and customers to leave. About 3 a.m. they took Albertoni downstairs and ordered him to call the two bartenders, Mario Ferrari and Alfred Casey, from the bar. The robbers ordered the bartenders to stand against a wall to be searched. Ferrari made a break for the door, and both robbers opened fire. Ferrari got to the street where he fell fatally wounded. Albertoni escaped from the building, and as he did so, he saw the robbers take the receipts for the night and flee.

At the trial Albertoni identified defendants Osuna and Gorman as the robbers. He remembered that the one he identified as Gorman was slender, had a dark complexion, and wore tight black pants, a black nylon windbreaker, black boots, green gloves, and a dark hood. He carried a revolver that Albertoni estimated to be between a .32 and a .45 caliber. The other robber was heavier, had a light complexion, and was over six feet tall; his eyes were light grey, flecked with red specks, with straight wrinkles radiating from them "like sun rays." He carried a .22 caliber pistol with a long shiny barrel and wore a black nylon windbreaker, light blue denim pants, black shoes, green gloves, and a brown-purple hood.

Albertoni's identification of defendants as the robbers and

killers was confirmed by a mass of other evidence. Two witnesses testified that the robbery was planned in their San Francisco apartment and that defendants were dressed as Albertoni described them. Percell, an accomplice who acted as a lookout, and his girl friend, who was apparently unaware that a robbery was planned, testified that they took defendants to the Mission Inn and after hearing shots saw defendants run out of the inn. A girl friend of Gorman's testified that defendants told her of their plans for the robbery at her apartment the previous afternoon and that they returned about 5 a.m. the next morning with three guns, money, and a money bag. Osuna described what had happened in considerable detail, but Gorman was relatively quiet. Later in the day defendants, the accomplice and his girl friend, and one of the women in whose apartment the robbery was planned had coffee together in a coffee shop where both defendants discussed the homicide in detail.

Other evidence was introduced to show that defendants got the guns they took to the Mission Inn during a burglary at a Sacramento home and that some of the guns that the police recovered from various places where defendants had abandoned them after the killing had been fired at the Mission Inn.

The only defense evidence at the trial on the issue of guilt was introduced by Gorman to establish an alibi for the Sacramento burglary. Neither defendant testified.

 Gorman contends that he was denied due process of law by the use of Albertoni's pretrial identification and the in-court identification based thereon. Albertoni testified that he identified Gorman at the district attorney's office, first by standing outside the door and listening to him talk with the district attorney for ten or fifteen minutes, and then by coming into the office and confronting him. Since the identification took place before the decisions of the United States Supreme Court in *United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926], and *Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951], neither the identification nor any product of it was inadmissible because Gorman did not have the assistance of counsel at the time. (*Stovall* v. *Denno* (1967) 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967] ; *People* v. *Feggans* (1967) 67 Cal.2d 444, 448 [62 Cal.Rptr. 419, 432 P.2d 21].) As in the *Feggans* case, however, we have scrutinized the record with respect to the pretrial identification to determine whether Gor-

man was denied due process. Since Albertoni had heard the robbers talk for over two hours but had not seen them unmasked, it was reasonable to seek a voice identification before Albertoni confronted Gorman. It might have been preferable to have Albertoni hear several persons speak, but in view of the length of time he was able to hear the robbers talk during the crime, it was not unreasonable to have him confront a single suspect. (Cf. *People* v. *Caruso* (1968) 68 Cal.2d 183, 188-189 [65 Cal.Rptr. 336, 436 P.2d 336]; *Simmons* v. *United States* (1968) 390 U.S. 377, 385 [19 L.Ed.2d 1247, 1254, 88 S.Ct. 967].) Moreover, there is nothing in the record to show that the district attorney in any way suggested the response Albertoni should make. We conclude that the procedure was not so suggestive as to give rise to a substantial likelihood of misidentification. (See *Simmons* v. *United States, supra,* 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253]; *Stovall* v. *Denno, supra,* 388 U.S. 293, 301-302 [18 L.Ed.2d 1199, 1205-1206].)

One witness testified to one conversation and three witnesses testified to another in which defendants discussed the homicide. The conversations were with defendants' friends or confederates and took place on the day of the killing while defendants were still at large.[1] Since each defendant implicated the other as well as himself, they invoke *People* v. *Aranda* (1965) 63 Cal.2d 518, 530-531 [47 Cal.Rptr. 353, 407 P.2d 605] (see also, *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620]), and each contends the other's statements were inadmissible against him. There is no merit in this contention. During each conversation both defendants recounted various details of the crimes. Had one disagreed with what the other said, it is reasonable to assume that he would have said so. Under these circumstances the statements of each were common admissions of both and therefore admissible against both. (See former Code Civ. Proc., § 1870, subd. 3; Evid. Code, § 1221; *People* v. *Robinson* (1964) 61 Cal.2d 373, 401 [38 Cal.Rptr. 890, 392 P.2d 970]; *People* v. *Simmons* (1946) 28 Cal.2d 699, 712 [172 P.2d 18].)

Defendants contend that the evidence of the Sacramento burglary was needlessly prejudicial. That evidence consisted of the testimony of an accomplice to the burglary,

---

[1]Since these conversations were initiated by defendants when they were not in custody and since there is nothing to indicate that they were not wholly voluntary, the trial court was under no obligation *sua sponte* to determine that the statements were voluntary before admitting them into evidence. (Cf. *Jackson* v. *Denno* (1964) 378 U.S. 368 [12 L.Ed.2d 908, 84 S.Ct. 1774, 1 A.L.R.3d 1205].)

which was corroborated by other evidence connecting defendants with the guns taken during the burglary. Evidence of that crime was relevant to show that defendants had the guns used in the robbery and murder. It played a significant part in completing a chain of physical evidence that could dispel any doubts with respect to Albertoni's identification of defendants or the testimony of witnesses who were or may have been accomplices. Under these circumstances the probative value of the evidence of the burglary outweighed any possible prejudicial effect the evidence might have had. (*People* v. *Stanley* (1967) 67 Cal.2d 812, 818 [63 Cal.Rptr. 825, 433 P.2d 913].)

Defendants contend that the district attorney committed prejudicial misconduct in his closing argument by telling the jury that Percell, the lookout for the Mission Inn robbery, had been sentenced for the robbery at the Mission Inn, whereas in fact he had been convicted of another robbery. The purpose of the argument was to rebut a possible inference that Percell testified pursuant to a bargain with the prosecution. No objection was made, however, and a timely admonition could have corrected any effect the misstatement could have had. (See *People* v. *Mitchell* (1966) 63 Cal.2d 805, 809 [48 Cal.Rptr. 371, 409 P.2d 211].) Moreover, Percell's testimony was merely cumulative of the testimony of many other witnesses. The error in misstating his record was not prejudicial.

Gorman contends that it was prejudicial error to allow Norene Michaels, one of the women in whose apartment the Mission Inn robbery was planned, to testify that she was afraid of Gorman because he had told her and others that he had been imprisoned because he cut off a woman's breast and crippled a man for life. There was no motion to strike or to admonish the jury to disregard the statement. Miss Michaels' fear of Gorman was relevant on the issue whether she was an accomplice whose testimony would require corroboration (Pen. Code, § 1111) or a person acting innocently under "threats or menaces" (Pen. Code, § 26, subd. Eight). Even if it is assumed that the prejudicial effect of Miss Michaels' statement of her reason for fearing Gorman outweighed its probative value and that a timely admonition could not have cured the error in admitting the statement, the error was not prejudicial. In view of the overwhelming evidence, we are convinced that the jury's knowledge of why Miss Michaels

feared Gorman did not contribute to its verdict on the issue of guilt. ▮ At the trial on the issue of penalty, the details of the crimes for which Gorman had been in prison were properly proved and his statement to Miss Michaels was revealed to be a somewhat exaggerated boast. As such, however, it was admissible at the trial on the issue of penalty to show his attitude toward his criminal career. (*People* v. *Bentley* (1962) 58 Cal.2d 458, 460-461 [24 Cal.Rptr. 685, 374 P.2d 645].)

▮ Gorman contends that the trial court improperly indicated to the jury its belief that defendants had been proved guilty (see *People* v. *Brock* (1967) 66 Cal.2d 645, 649 [58 Cal.Rptr. 321, 426 P.2d 889]) by discussing the timing of the trial on the issue of penalty before the conclusion of the trial on the issue of guilt. There is no merit in this contention, for the trial judge's remarks did not indicate that he believed that there would be a trial on the issue of penalty but merely set forth for the convenience of the jury how long such a trial would take if it occurred.

▮ There is also no merit in Osuna's contention, made in propria persona, that the prosecution suppressed the fact that certain witnesses were subpoenaed from outside the state. He asserts that this fact would be relevant to show the witnesses' flight, which would in turn support an inference that they were accomplices. There was no suppression of evidence, however, for the subpoenaing of the witnesses was a matter of record readily available to the defense.

With respect to the instructions at the trial on the issue of guilt, it is contended that the trial court erred in failing to instruct on second degree murder; in failing adequately to set forth the purpose for which the evidence of the Sacramento burglary was admitted; and in describing the jury's duty in terms of determining the guilt or innocence of each defendant instead of in terms of determining whether each defendant was guilty or not guilty. ▮ Since there was no evidence that the homicide was other than a first degree robbery murder, the trial court properly refused to instruct on second degree murder. (*People* v. *Imbler* (1962) 57 Cal.2d 711, 715 [21 Cal.Rptr. 568, 371 P.2d 304].) ▮ The court's instructions on the evidence of the Sacramento burglary were adequate for a proper consideration of the evidence. Defendants did not request a more detailed instruction and the instruction offered by the prosecution was not appropriate to the facts of the case. Accordingly, no error in this respect

appears. (See *People* v. *Wade* (1959) 53 Cal.2d 322, 334 [1 Cal.Rptr. 683, 348 P.2d 116].) The court's references to finding defendants innocent rather than not guilty were in no way misleading and did not indicate that defendants had any burden to prove themselves innocent. Thus, the court clearly instructed that a finding of innocence would be compelled by the failure of the prosecution to prove guilt "to a moral certainty and beyond a reasonable doubt."

 Although there was no prejudicial error at the trial on the issue of guilt, the judgment imposing the death penalty must be reversed because of the error condemned in *Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 521-523 [20 L.Ed.2d 776, 784-786, 88 S.Ct. 1770]. Twenty prospective jurors were excused for cause who voiced objections to the death penalty. Of these, at least seven did not make "unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*." (391 U.S. 510, 522, fn. 21 [20 L.Ed. 2d 776, 785], italics in the original.)

Four prospective jurors were excused who stated that they did not "think" that they could impose the death penalty, but none gave an unambiguous answer to the question whether he could or could not do so. (See *People* v. *Chacon* (1968) 69 Cal.2d 765, 772-773 [73 Cal.Rptr. 10, 447 P.2d 106].)

Another prospective juror was asked, "Do you believe because of your feeling or objection toward the death penalty you would find yourself unable to return a verdict of death?" His answer, "Because of my objection to the death penalty —," was cut off by the prosecutor's challenge, which was allowed without permitting the prospective juror to complete his answer.

Another prospective juror stated that she was "against the death penalty and it would affect any decision I would have to make." She was then asked, "On the question of guilt or innocence or on the question of penalty and a verdict of first degree murder is found—." She interrupted. "Yes," and the question continued, "—you could not be listening carefully to the instructions of the Court and applying them to the instructions, it wouldn't dispel your prejudice in that effect?" She answered, "I have thought it over and I don't

think I could." It is impossible to determine from this exchange whether the prospective juror believed that her prejudice would affect her decision on the issue of guilt or only her decision on the issue of penalty. She did not state that her opposition to the death penalty would prevent her from voting for that penalty without regard to the evidence. Accordingly, she did not make "unmistakably clear" either that she would automatically vote against the death penalty or that her attitude toward the death penalty would prevent her from making an impartial decision on the issue of guilt.

The seventh prospective juror whose exclusion is in question stated that "I guess I feel strongly that I could not" return a verdict of death. After another question she stated, "I think I could go into it [the penalty phase] with an open mind. I'm afraid what I feel—I don't know." The prosecutor then stated, "You indicated to us earlier you didn't think that you could return a verdict of death. It is an awesome thing. I know it. We want people with no strong feelings one way or the other, neutral people. . . . Do you feel from everything that has been said that you do not have an open mind on the matter of punishment involved in a capital case—that there is nothing wrong with it." The prospective juror answered, "I feel I do not," and was then excused. Here again there was a failure to meet the *Witherspoon* requirements for exclusion for cause.

The judgment is reversed insofar as it relates to penalty. In all other respects the judgment is affirmed.

Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

McCOMB, J.—I would affirm the judgment in its entirety. (Cal. Const., art. VI, § 13.)