[Crim. No. 15306. Second Dist., Div. Four. May 29, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. JOHN PAUL SMITH, Defendant and Appellant.

548

Kate Whyner, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Edward Duddy, Deputy Attorney General, for Plaintiff and Respondent.

FILES, P. J.—A jury found defendant guilty of robbery, first degree (Pen. Code, § 211). The verdict and judgment also contain the finding that defendant was armed at the time of the offense. This is defendant's appeal from the judgment. The notice of appeal also refers to the order denying a new trial, which is not an appealable order.

On August 21, 1967, at 8:15 a.m., at Harrison's Market, in Reseda, the manager, Jerry Begley, and the meat manager, John Elson, were preparing for the day's business. Defendant and another man (later identified as Cantino), both dressed in business suits and carrying briefcases, entered and displayed pistols. On orders of the intruders, Begley locked Elson in the meat refrigerator, and then opened the safe and removed currency, rolls of coins and checks, which he placed in the two briefcases. The robbers then locked Begley in the meat refrigerator and departed with their briefcases.

Begley estimated that the robbers were in the store " 'about fifteen minutes,' " and his attention was on them throughout that time. Elson, while in the refrigerator, was able to peek out through a ¾-inch opening and observe what was going on.

Immediately after the robbers left, the victims released themselves by means of a safety device inside the refrigerator. They recalled that as they had come to work that morning they had observed an automobile parked outside, in which three men had been seated. Elson looked outside and found the vehicle had gone. Begley telephoned the police and gave them a description of the robbers and the vehicle. This robbery report was immediately broadcast by police radio.

About 8:30 a.m., Officer Judd, on patrol in a police vehicle,

saw a black car which seemed to fit the robbery report, proceeding away from the location of Harrison's Market. Judd followed that car until it stopped in the parking area of a liquor store at De Soto and Sherman Way. Officer Hayhoe, passing by in another police vehicle, stopped to assist. Defendant was in the rear seat of the black car, and two other men were in front. All three stepped out and entered the liquor store. Then one of them (later identified as Melvin Klein), who had been the driver of the black car, returned. The other two walked across the street. Officer Hayhoe had a conversation with Klein, following which Klein consented to an inspection of the two briefcases which were on the rear seat of the black car.[1]

Inside the bags the officers found the loot of the robbery and a quantity of .38-caliber ammunition. They immediately arrested Klein and started a search of the neighborhood for his two companions.

Officer Cowell, who joined the search, received some information which led him to the home of Mrs. Arrias, about four blocks from the liquor store. After obtaining Mrs. Arrias' permission, Officer Cowell entered and found defendant hiding in a clothes closet.[2] Defendant was arrested at 9:10 a.m. and taken to the West Valley police station. In defendant's pocket were two keys which fitted the locks on the briefcases which had been recovered from the black car. The victims, Begley and Elson, were then asked to come to the police station where, at about 10 or 10:30 a.m., they saw defendant in a showup, and positively identified him as one of the robbers. At this same visit to the station the victims also identified the black automobile as the one which had been parked alongside the market at 8:15 a.m., and they looked at the money and checks which had been found in the briefcases.

At the trial Begley and Elson identified defendant as one of the men who had robbed them, and Officers Judd and Hayhoe identified him as the man who had been in the rear seat of the black car when it had stopped at the liquor store. There was testimony that the fingerprints of defendant were found on

[1] There was no issue raised at the trial as to the genuineness of that consent. It seems likely that while in the liquor store the three men, having seen the officers, decided that Klein, as the owner and driver of the car, could not avoid incrimination by what was in the briefcases, so he went back to face the officers while the other two, who were as yet unidentified, attempted to escape.

[2] There is no dispute over the genuineness of this consent. Apparently Mrs. Arrias had no idea that the fugitive had entered her house before the officer arrived.

the outside of the right rear window of the black car. The checks recovered from the briefcases were stamped with the endorsement of Harrison's Market, and the amount of money in the briefcases was the exact sum which was missing from the market safe.

The defense consisted almost entirely of an intensive examination of the conditions under which the showup had been conducted on the morning of August 21, 1967. Defendant testified only for the limited purpose of stating his height and weight. No alibi evidence was offered.

Prior to the trial there was a separate hearing on defendant's "motion to suppress evidence on the grounds that the pretrial identification procedures did not comply with the standards set down by the United States Supreme Court cases of . . . Wade, Stovall, and Gilbert, . . ."[3] The motion was not stated any more specifically than this but, from what followed, it was apparently the purpose of counsel to obtain an order excluding (a) evidence that Begley and Elson had identified defendant in a showup on the day of the robbery, and (b) the courtroom identification testimony of these witnesses on the grounds (1) that defendant had not been represented by counsel at the showup, and (2) the confrontation was "so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law" (see *Stovall* v. *Denno* (1967) 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967]).

The offense charged in this case was committed after the three United States Supreme Court cases referred to by counsel, but all of the trial proceedings here were completed before the California Supreme Court had decided *People* v. *Caruso* (1968) 68 Cal.2d 183 [65 Cal.Rptr. 336, 436 P.2d 336].

The pretrial hearing on this subject required a day and a half of testimony, which included the examination of one police officer, the two victims, the two suspects, and three other prisoners who participated in the lineup. The five men stood up in the courtroom for the court to make comparisons. At the conclusion of the hearing, the court made its oral findings: (1) the defendant "knowingly and intelligently and deliberately" waived his right to counsel at the showup, and (2) the showup was not unfair.

Two weeks later, while the court was hearing pretrial dis-

[3]*United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; *Stovall* v. *Denno* (1967) 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967]; *Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951].

covery motions, defendant was granted leave to reopen the showup question. More testimony was taken, following which the court readopted its former findings.

██ The Attorney General argues that defendant is not entitled to a review of those findings because he did not object to any of the People's evidence on that ground during the trial itself. The judge who actually tried the case was not the judge who had heard the pretrial motion and had ruled that the showup was not unfair.

Although the record is by no means explicit on this point, we think it was the understanding of both attorneys and of the trial court that the legality of the showup procedure would be determined in the pretrial hearing and that the ruling there made would be binding throughout the trial. The judge who heard the motion to suppress stated his belief to that effect at the time he ruled.

Inasmuch as the case was tried upon the understanding that the admissibility of the victims' identification would be determined at the pretrial hearing, and since the defendant made no objection when the evidence was presented to the jury, it was unnecessary for the People to reintroduce at the jury trial all of the evidence which went to establish admissibility.

We note that the procedure followed was not the statutory procedure under Penal Code section 1538.5, which applies only to a motion to suppress evidence "obtained as a result of a search or seizure." (See *People* v. *Superior Court* (1969) 70 Cal.2d 123, 127-130 [74 Cal.Rptr. 294, 449 P.2d 230].) The motion to suppress in this case was a somewhat analogous means of getting a ruling on a preliminary issue of fact to be decided by the court alone, prior to the selection of a jury, so that the jury would not be kept waiting while that issue was tried. Furthermore, the pretrial procedure enabled both sides to plan trial tactics in the light of the trial court's ruling upon this vital issue. It is obvious that defendant never intended to waive his attack upon the showup, and there is no reason to think the prosecution was misled. The issue is therefore open for review on appeal.

At the pretrial hearing witnesses were kept out of the courtroom so they could not hear the testimony of the others. The evidence received was conflicting on many points, some important.

██ With respect to the waiver of counsel the record is very simple. The investigating officer in the case, Sergeant Zellers, who conducted the showup, testified that he advised

defendant he had a right to have an attorney present during the showup and asked if he wanted one. Defendant answered " 'No, I do not.' "

Defendant testified concerning his height and weight, but he was not asked anything about waiver of counsel. Two weeks later, when the hearing was reopened, he again took the witness stand and this time denied that anyone had advised him of his right to have an attorney at the showup. The conflict in the evidence was resolved by the finding of the trial court, and there is no basis for overturning it in this court.

The evidence most favorable to the court's ruling on the fairness of the showup must be stated in some detail.

Sometime between the 9:10 a.m. capture of defendant and the showup (10 or 10:30 a.m.) Sergeant Zellers telephoned Begley at the market and "told him that we had arrested some people and that I wanted him to come to the station and attend a show-up." Begley and Elson immediately drove to the West Valley police station. Zellers testified that he did not tell the victims anything about the suspects, nor did he, prior to the showup, let them see the briefcases and the contents which had been recovered.[4] Begley (without Elson) was allowed to look through a one-way window at a lineup of at least five men.[5] He immediately informed Zellers that defendant was one of the robbers. Zellers asked Begley to "go back and make certain." Begley replied that he didn't need to look again. Elson then separately viewed the line and identified defendant.

After that the victims were shown the property which had been recovered and were told how it had been found. They identified the contents of the briefcases, and the black car.

When Begley made his first report to the police he described one of the robbers as approximately 6 feet tall, about 180 to 185 pounds, with "dishwater blond" curly hair. Elson testified that his first report to the police was that one of the robbers was about 6 feet tall, weighing between 185 and 200 pounds, with a fair complexion.

The police report shows that the other person who had entered the market that morning had been described by the victims as a male Caucasian, 5-feet-2, 120 pounds, possibly Italian.

---

[4]The testimony of Begley and Elson conflicted with Zellers, and with each other, as to the sequence of events.

[5]Sergeant Zellers said his recollection was that there were six or seven in the lineup. Five persons who were in the lineup all testified there were five only. Begley and Elson agreed.

Each of the five identified members of the lineup testified to his own height and weight as follows:

| | | |
|---|---|---|
| Defendant John Paul Smith | 5 feet 9 inches | 197 pounds |
| Melvin Klein | 5 feet 8 inches | 220 pounds |
| George Navarrete | 5 feet 5 inches | 169 pounds |
| Richard Manuel Campos | 5 feet 11 inches | 179 pounds |
| Anthony Bracamont Hernandez | 5 feet 6 inches | 160 pounds |

The evidence contains no photograph of any of the five except a single snapshot of Klein.

It is apparent from this list that defendant was not quite as tall as the victims had originally estimated, and that Campos' height and proportion were closer to that estimate than were defendant's. The three men with Spanish surnames were all prisoners in the West Valley police station at the time of the lineup.[6] It seems to have been accepted at the hearing that the three were all ''Mexican Americans.''

In ruling on the motion to suppress, the judge said:

'' [Defense counsel] has made some misstatements of fact which are in the record with regard to the color of some of the gentlemen that appeared here in a mock line-up.

''It's true that some of them were dark, but some of them were not dark; and it's true, some of them had mustaches and some of them didn't, and there were some errors that crept into the record in that regard. . . .

'' Certainly, there were differences in the appearances of the various individuals in the mock line-up, but with all due deference to [counsel], the variances could have [been] much greater than they were.''

The *Wade, Gilbert* and *Stovall* decisions declare the objective of avoiding the miscarriages of justice which can arise from preventable misidentification of suspects prior to trial. The *Wade* opinion explored the problem and concluded that a pretrial confrontation for identification was a critical stage, at which the suspect was entitled to the assistance of counsel.

*Stovall* v. *Denno, supra,* 388 U.S. 293, was a habeas corpus proceeding attacking a conviction upon the asserted ground that the pretrial identification had been unfair. The Supreme Court there held that the newly announced right to counsel would not be given retrospective application, but pointed out that the petitioner might be entitled to relief if ''the confrontation conducted in this case was so unnecessarily sug-

---

[6]At the trial police testified that on the day of the lineup there were 13 male adults in custody at the West Valley station: the 2 suspects, 10 men with Spanish names, and 1 ''borderline hippie'' with long hair and dirty clothing.

gestive and conducive to irreparable mistaken identification that he was denied due process of law." (At pp. 301-302 [18 L.Ed.2d at p. 1206].) There the witness was a woman hospitalized for major surgery to save her life. Petitioner was brought to her hospital room the day following his arrest, where she identified him. In affirming the decision of the Court of Appeals, which had denied relief to petitioner, the Supreme Court said (at p. 302 [18 L.Ed.2d at p. 1206]): "The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned. [Fn. omitted.] However, a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it, and the record in the present case reveals that the showing of Stovall to Mrs. Behrendt in an immediate hospital confrontation was imperative. The Court of Appeals, en banc, stated, 355 F.2d, at 735, 'Here was the only person in the world who could possibly exonerate Stovall. Her words, and only her words, "He is not the man" could have resulted in freedom for Stovall. The hospital was not far distant from the courthouse and jail. No one knew how long Mrs. Behrendt might live. Faced with the responsibility of identifying the attacker, with the need for immediate action and with the knowledge that Mrs. Behrendt could not visit the jail, the police followed the only feasible procedure and took Stovall to the hospital room. Under these circumstances, the usual police station lineup, which Stovall now argues he should have had, was out of the question.' "

Succeeding decisions have emphasized that the test is a pragmatic one. (See *Simmons* v. *United States* (1968) 390 U.S. 377 [19 L.Ed.2d 1247, 88 S.Ct. 967]; *Foster* v. *California* (1969) 394 U.S. 440 [22 L.Ed.2d 402, 89 S.Ct. 1127]; *People* v. *Osuna* (1969) 70 Cal.2d 759, 764-765 [76 Cal.Rptr. 462, 452 P.2d 678].)

The *Simmons* case involved a bank robbery. When several group photographs were shown to five bank employees, all of them pointed out Simmons' pictures as representing one of the robbers. The opinion of the court, after discussing the similarities and differences between scrutiny of photographs and identification by personal view, announced that the standard to be applied "accords with our resolution of a similar issue in *Stovall* v. *Denno*, . . ." (At p. 384 [19 L.Ed.2d at p. 1253].)

Applying that standard, the Supreme Court pointed out

(a) there was a compelling need to identify the robbers so as to facilitate prompt capture; (b) there was little chance of misidentification in this case because the robbery took place in a well lighted bank, where the employees had been able to see the robbers for periods ranging up to five minutes; (c) the witnesses were shown the pictures only a day later, while their memories were fresh; (d) each witness made the identification independently of the others, without any suggestive comments by the Federal Bureau of Investigation agents; and (e) these initial identifications were all confirmed by testimony at trial, where the witnesses, under cross-examination, showed no doubt of their respective identifications. Upon this analysis, the Supreme Court concluded there had been no violation of due process.

In *Foster* v. *California, supra,* there was first a three-man lineup, at which time the witness was not positive, then a one-man confrontation, when the witness was not sure, then, seven to ten days later, a five-man lineup, where the witness said he was sure. Again invoking the *Stovall* test, the court held that the "totality of the circumstances" indicated a denial of due process of law.

■ Applying the *Stovall* test to the case at bench, we cannot say that the trial court erred in its finding. These circumstances are pertinent:

(1) The showup took place not more than 2 hours after the robbery. The promptness of the confrontation, as *Stovall* and *Simmons* point out, tends to favor accuracy of identification.

(2) The victims had had an excellent opportunity to see defendant. Begley was in defendant's company 10 or 15 minutes.

(3) Each victim promptly and positively identified defendant without help from the other or prompting by the police. The evidence supports a finding by the trial court that nothing was said or shown to the witnesses to influence them prior to the identification.

(4) There was a reasonable spread of heights and weights in this lineup, some being taller, some shorter, some heavier, some lighter, but not by a great margin. Except for differences in complexion and facial appearance (which the trial court could observe and we cannot) there do not seem to have been any dramatic distinctions between defendant and the others.

(5) The victims did not automatically select any likely suspect presented to them by the police. The victims were looking for two robbers, but they pointed out only one in the

lineup. From the standpoint of the police Klein was a prime suspect because he had been the driver of the car in which the loot had been found. But he had not entered the market and the victims could not identify him. Viewed in this light, the showup was a useful test of credibility of the witnesses.

(6) Finally, since the *Stovall* test refers to "unnecessarily suggestive" procedures, the trial court was required to consider the practical situation facing the officers. If the police had taken the time to find and bring in more people from other places, they probably could have had more men in the lineup looking more like defendant. But to accomplish this would have caused a delay, sacrificing the benefit of a fresh memory. There is no evidence there were available at that time any other and better stand-ins than those produced.

The *Stovall* decision approved a one-man showup under the exigent circumstances which existed there. Under a variety of other circumstances California courts have held that a one-man confrontation was not a violation of due process. (See *People* v. *Osuna* (1969) 70 Cal.2d 759, 764 [76 Cal.Rptr. 462, 452 P.2d 678]; *People* v. *Burns* (1969) 270 Cal.App.2d 238, 245-246 [75 Cal.Rptr. 688]; *People* v. *Irvin* (1968) 264 Cal. App.2d 747, 759 [70 Cal.Rptr. 892]; *People* v. *Smith* (1968) 263 Cal.App.2d 631, 637 [69 Cal.Rptr. 670]; but see *People* v. *Superior Court* (1968) 69 Cal.2d 491, 496, fn. 3 [72 Cal. Rptr. 330, 446 P.2d 138].)

The showup in the case at bench was far more favorable to defendant than a one-man confrontation would have been.

Defendant's argument here places particular emphasis upon *People* v. *Caruso* (1968) 68 Cal.2d 183 [65 Cal.Rptr. 336, 436 P.2d 336] and *People* v. *Menchaca* (1968) 264 Cal. App.2d 642 [70 Cal.Rptr. 843], where, in showups conducted prior to the *Stovall* decision, the defendant's appearance was strikingly dissimilar to that of anyone else. The application of the *Stovall* standard in those cases compelled a finding that the pretrial procedures violated due process. Those decisions, and others which have followed them, are distinguishable here because of the difference in the "totality of the circumstances," and because, in a hearing painstakingly conducted by the trial court in the light of the *Wade-Stovall* requirements, the trial court found that the showup was not conducive to irreparable mistaken identification.

It should also be pointed out that, in this case, unlike a great many robbery trials, the People had circumstantial proof which was even more compelling than the identification testimony of the victims. A few minutes after the robbery

defendant was seen in the rear seat of an automobile which resembled one that had been seen at the market immediately before the robbery. He left the vehicle and disappeared into the neighborhood. The entire loot, conclusively identified as such, was found on the seat which defendant had just occupied. Defendant's fingerprints were found on the car, foreclosing any quibble over whether he was the man the two officers had seen there. Approximately 30 minutes later defendant was found, his face dripping perspiration, crouched in a clothes closet of a home to which he had not been invited. In his pocket were keys which fitted the briefcases found in the car. Defendant offered no evidence either to refute or explain these circumstances. Had the testimony of the victims been excluded, the result could have been no different. This is one case in which the eyewitness testimony was purely cumulative, and we are able to say that its use, if error, was harmless beyond any doubt.

█ There is no validity in defendant's contention here that the district attorney committed prejudicial misconduct by making an argument to the jury which contained "misstatements of law." The challenged statements consist of the prosecutor's argument that the evidence indicated that the lineup was fair and the identification testimony was credible. This was a proper comment upon the evidence, and a reply to the theory upon which the defendant had chosen to try the case. The greater part of the record of the trial consisted of defendant's attack upon the showup procedure and his attempt to show it was unfair to him.

The case was exhaustively tried and defendant was fairly convicted. █ The form of the judgment is defective in one respect: Under the recent decisions of the Supreme Court, when a defendant is convicted of armed robbery it is improper to include a separate finding that he was armed with a deadly weapon. (See *People* v. *Sesser* (1969) 269 Cal.App. 2d 707, 712-713 [75 Cal.Rptr. 297] ; *People* v. *Bonville* (1968) 268 Cal.App.2d 107 [73 Cal.Rptr. 741].) The judgment is modified by striking therefrom the finding that defendant was armed. As so modified, the judgment is affirmed. The purported appeal from the order denying a new trial is dismissed.

Jefferson, J., and Kingsley, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 23, 1969. Peters, J., was of the opinion that the petition should be granted.