[Crim. No. 12341.   In Bank.   Aug. 20, 1969.]

In re BOOKER T. HILLERY, JR., on Habeas Corpus.

Marvin W. Friedman, under appointment by the Supreme Court, for Petitioner.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, and Edsel W. Haws, Deputy Attorney General, for Respondent.

TOBRINER, J.—In his petition for a writ of habeas corpus after a second penalty trial, petitioner Booker T. Hillery, Jr., presently under sentence of death after conviction of first degree murder (*People* v. *Hillery* (1965) 62 Cal.2d 692 [44 Cal.Rptr. 30, 401 P.2d 382], reversed as to penalty, cert. den. (1967) 386 U.S. 938 [17 L.Ed.2d 810, 87 S.Ct. 958], reh. den. 386 U.S. 1000 [18 L.Ed.2d 355, 87 S.Ct. 1310]; *People* v. *Hillery* (1967) 65 Cal.2d 795 [56 Cal.Rptr. 280, 423 P.2d 208], cert. den. 389 U.S. 986, [19 L.Ed.2d 496, 88 S.Ct. 486], reh. den. (1968) 390 U.S. 913 [19 L.Ed.2d 887, 88 S.Ct. 822]), contends that under the rule of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], the trial court erroneously excused for cause certain prospective jurors who expressed conscientious opposition to the death pen-

alty. ■ Upon a review of the *voir dire* examination conducted at petitioner's second penalty trial, we have concluded that a *Witherspoon* error occurred.

Mrs. Bernice Hope, a juror whom the trial court excused for cause because of conscientious opposition to capital punishment, did not make it "unmistakably clear . . . that [she] would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before [her]. . . ." (*Id.* at p. 522 & fn. 21 [20 L.Ed.2d at pp. 784-785].)

The trial court excused Mrs. Hope for cause after she stated that she did not think she could follow "the law" of California with respect to the imposition of capital punishment. The court never explained, however, that the jury decision as to penalty would be "a subjective evaluation that you must make on your own." (See *People* v. *Varnum* (1969) 70 Cal. 2d 480, 495 & fn. 9 [75 Cal.Rptr. 161, 450 P.2d 553].) Neither did the court adequately explain that Penal Code sections 190 and 190.1 vest in the jury an "absolute" discretion to determine whether a defendant in a capital case should suffer death or life imprisonment, and that this discretion remains completely unlimited by any rules of law which might otherwise control a juror's determination as to the penalty in the case before him. On the contrary, the trial court suggested, by its questioning of Mrs. Hope and by statements and questions directed to other jurors, that "the law" of California required a juror to concur in a verdict imposing the death penalty in certain defined classes of cases.

We have consistently condemned exclusions for cause based upon a juror's statement that he could not vote for the death penalty "in a proper case," when the trial court, by failing to define the term "proper case" in light of the juror's absolute discretion to determine the appropriate penalty, suggests to the particular juror "that the law classes certain kinds of cases as 'proper' for the infliction of the death penalty and that, if the defendant is found guilty of a crime of this class, the jury will be *required* to impose the death penalty." (*People* v. *Teale* (1969) 70 Cal.2d 497, 515 [75 Cal.Rptr. 172, 450 P.2d 564]; *People* v. *Morse* (1969) 70 Cal.2d 711, 742 [76 Cal.Rptr. 391, 452 P.2d 607]; see generally, *People* v. *Varnum, supra,* 70 Cal.2d 480, 491-496.) The same considerations which support the rationale in these cases require us to hold erroneous the instant exclusion for cause based upon a juror's statement that she could not follow "the

law" of California. Here the trial court, by failing to explain that the law of California grants to the jurors absolute discretion, devoid of standards or directions to determine the appropriate penalty, suggests to the particular juror that "the law" required a juror to concur in a verdict imposing the death penalty in certain defined classes of cases. Accordingly, under compulsion of *Witherspoon*, we must reverse the judgment imposing the death penalty.

The specific *voir dire* examination of venireman Hope extended over five pages of the record.[1] At the end of the exchange between the court and Mrs. Hope, the trial court stated the basis for his exclusion for cause: "[W]e don't quarrel with anyone who disagrees with our law, of course, but it disqualifies you to serve as a juror in this case." Mrs. Hope's statement of disagreement with "the law" and of her inability to follow "the law" appeared in the context of the trial court's statements that, "[I]t is the law of California and it includes the death penalty," and "[I]t is on the stat-

---

[1] "THE COURT: Q Mrs. Hope, I believe you have been present throughout the proceedings today, have you not?

"MRS. HOPE: Yes, sir.

"Q You understand that we are interested in selecting a fair and impartial jury to determine what the penalty should be in the defendant's case?

"A Yes, sir.

"Q Either life in prison or death?

"A Yes.

"Q One or the other?

"A Yes.

"Q Depending upon how the jurors view the evidence and the law which will be given to them by the Court. Do you happen to be acquainted with Mr. Hillery?

"A No.

" . . . . . . . . .

"Q Before you came to the courthouse were you among the numerous people, I imagine, who read and heard something about this case?

"A Yes, I read it in the papers, heard something about it over the radio this morning.

"Q Was there anything about what you read or heard which left you with any fixed opinion or beliefs as to what the penalty should be in this case?

"A No.

"Q You are perfectly open minded at this time, is that right?

"A Yes, sir.

"Q You won't close your mind and determine what the penalty should be until after you have heard the testimony, heard the instructions so far as the rules of law are concerned, is that correct?

"A No.

"Q I mean, would you keep an open mind and wait to make up your mind until after you have heard the Court's instructions and all evidence?

"A Yes, sir.

"Q All right. You see, that is a requirement, of course. I take it,

ute books, it is still our law to be applied in a proper case, . . ." The trial court never explained to Mrs. Hope that the law of California provided that the determination as to the imposition of capital punishment would rest within the absolute discretion of the jurors. The court never explained that, "What constitutes a proper case [for the imposition of the death penalty] is . . . for the juror to decide." (*People* v. *Bandhauer* (1967) 66 Cal.2d 524, 531 [58 Cal.Rptr. 332, 426 P.2d 900].)

The inevitable result of the trial court's unexplained references to "the law" and "proper case" was that Mrs. Hope responded to the examination under the impression that "the law classes certain kinds of cases as 'proper' for the infliction of the death penalty and that, if the defendant is found guilty of a crime of this class, the jury will be *required* to impose the death penalty. A venireman under this impression, conceiving that his oath as a juror might require him to concur in a verdict of death in a case which the law deemed 'proper' for that penalty—but which he himself did not deem 'proper' therefor—might well reply in the affirmative to the court's question as to whether his scruples would prevent his concurrence in a verdict of death 'in a proper case.' " (*People* v. *Teale, supra,* 70 Cal.2d 497, 515-516.) A fortiori, such a juror might well respond in the affirmative to a question as to whether his scruples would prevent him from following "the law" which is "to be applied in a proper case." Such a

---

then, you have no opinion one way or the other as far as the penalty, life imprisonment or death, as you sit in the jury box, is that correct?

"A Well, I don't think I could send anyone to death.

"Q Well, that was the next question I was going to ask you. Do you entertain such a conscientious opinion as it would preclude you from assessing the death penalty in a proper case?

"A I don't think I could put anyone in the—not necessarily in this case, but in any case—

"Q You understand, do you, that it is the law of California and it includes the death penalty?

"A Yes.

"Q There has been a lot of sparring, discussion, and debate about the matter, but it is on the statute books, it is still our law to be applied in a proper case, do you understand that?

"A Yes, sir, I understand that.

"Q I take it, from your response, that even though that is the law you don't think you could follow the law, is that it?

"A No, I don't think I could.

"Q All right. Well, you are entitled to your conscientious beliefs, of course, and we don't quarrel with anyone who disagrees with our law, of course, but it disqualifies you to serve as a juror in this case. So, the Court will necessarily have to excuse you.

"A Yes, sir.

"Q Maybe we will get you in some other case at some other time."

response in either case does not satisfy the mandate of *Witherspoon* that the prospective juror must make it "unmistakably clear . . . that [he] would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before [him]. . . ." (*Witherspoon* v. *Illinois, supra,* 391 U.S. at p. 522 & fn. 21 [20 L.Ed.2d at pp. 784-785].)

In the present case, Mrs. Hope indicated that she did not think she could follow "the law"; and that she understood that "it [presumably capital punishment] is still our law to be applied in a proper case." Unless at some time during or prior to the specific *voir dire* examination of Mrs. Hope, the trial court corrected the erroneous impression generated by the references to "the law" and "in a proper case," we must conclude that this juror's exclusion for cause violated the rule of *Witherspoon* as applied in the *Teale* and *Varnum* cases.

An examination of the preceding *voir dire* directed at other prospective jurors reveals that the trial court never adequately explained that "the law" of California allows a juror to determine the penalty in his absolute discretion; neither did the court define "proper case" in terms which would adequately explain that "What constitutes a proper case is . . . for the juror to decide." (*People* v. *Bandhauer, supra,* 66 Cal.2d 524, 531.) In fact, the trial court referred to the "rules of law to apply to the facts," thus affirmatively suggesting that "the law" required the imposition of capital punishment in certain defined classes of cases.

Early in the *voir dire*, the trial court told the jury that it had "absolute discretion" to determine the penalty *"under the law*, which the court will give them." (Italics added.) Although the court here correctly stated that the jury decision at the penalty trial rested within the jurors' absolute discretion, the court proceeded to obscure this correct statement by suggesting to the jury that the court would render instructions on rules of law which would guide and limit the jury in reaching its verdict. The trial court generated a contradiction within its own statement by speaking on the one hand of "absolute" discretion and on the other of a jury determination "under the law." Indeed, absolute discretion necessarily requires freedom from controlling rules or instructions. By stating that the court would render instructions on the law relevant to the jury's determination of the penalty, the trial court implied that the jury decision would not rest

within the jurors' absolute discretion. Under such circumstances, we may not assume that the jury panel in general, nor Mrs. Hope in particular, understood that the jury decision as to penalty would involve "a subjective evaluation that you must make on your own." (*People* v. *Varnum, supra,* 70 Cal.2d at p. 495 & fn. 9.)[2]

The trial court further obscured a correct statement of the nature of the jury decision as to penalty when it referred to "the evidence and the law [which] warranted [capital punishment]," and, ". . . [o]ur laws do provide for the death penalty in the proper case." The prosecutor added to this confusion when he referred to "the factual situations that are presented in a proper case for the death penalty." These references inevitably imply that standards for decision-making exist outside a particular juror's subjective determination; they suggest legal categories (e.g., certain defined "factual situations"), in which the jury *must* impose the death penalty. The references are misleading because, in fact, the juror's decision as to penalty involves no guides or standards; the jury renders its verdict after each individual juror determines the appropriate penalty within his absolute discretion.

The trial court neither explained to Mrs. Hope in particular, nor to the jury panel in general, that "the law" of California allows the jurors to determine, within their absolute discretion, what constitutes "a proper case" for the imposition of capital punishment. For this reason, the trial court committed reversible error in excusing Mrs. Hope for cause after she stated she could not follow "the law" which "includes the death penalty" and which is "to be applied in

---

[2]Later, in the *voir dire* examination of the prospective jurors, the trial court stated, "This matter is entirely within the discretion of the jury after they have heard all the evidence, have been instructed by the Court concerning the *rules of law.*" (Italics added.) Such a statement fails, for the reasons discussed in the text, adequately to inform the jury that the decision as to penalty rests within their absolute discretion without controlling rules of law, standards, or instructions.

During the *voir dire*, the prosecutor told the jury that the decision as to penalty "is solely open to your discretion." This statement occurred in the context of his explanation that neither party possessed the burden of proof at the penalty trial. The prosecutor did not define the quality of the jurors' discretion as "absolute." Later in the *voir dire*, the prosecutor stated that a juror may exercise his "absolute discretion, of course, based upon the instructions that the Court will give you." As with the similar statements by the trial court quoted above in the footnote and in the text, such a statement failed to inform the jury that the decision as to penalty rests within their absolute discretion without controlling rules of law, standards, or instructions.

a proper case." Accordingly, the judgment imposing the death penalty upon petitioner cannot stand.

Nor can we accept the Attorney General's argument that statements by Mrs. Hope rendered earlier in her *voir dire* examination reveal an adequate basis for excusing her for cause under *Witherspoon*. Mrs. Hope's first expression of scruples concerning the imposition of capital punishment appeared in her statement, "Well, I don't think I could send anyone to death." We have held that such a statement would not, by itself, satisfy the *Witherspoon* requirement of unambiguous expression of an absolute inability to consider imposing the death penalty in any case. (*People* v. *Osuna* (1969) 70 Cal.2d 759, 768 [76 Cal.Rptr. 462, 452 P.2d 678]; *People* v. *Chacon* (1968) 69 Cal.2d 765, 772 [73 Cal.Rptr. 10, 447 P.2d 106].) Furthermore, the trial court's *question* to which Mrs. Hope responded sought to determine only whether she had "an opinion one way or the other as far as the penalty." We have consistently held that an affirmative response to such an inquiry cannot stand as a basis to sustain a challenge for cause under *Witherspoon* (*In re Eli* (1969) *ante*, pp. 214, 215-217 [77 Cal.Rptr. 665, 454 P.2d 337]; *People* v. *Osuna, supra,* 70 Cal.2d 759, 769; *People* v. *Risenhoover* (1968) 70 Cal.2d 29, 55-56 [73 Cal.Rptr. 533, 447 P.2d 925]; *In re Anderson* (1968) 69 Cal.2d 613, 617-618 [73 Cal.Rptr. 21, 447 P.2d 117].)

Because her statement occurred in the context of a question whether she had any opinion "one way or the other" concerning the alternative penalties, we cannot reasonably construe Mrs. Hope's response as indicative of anything more than tentative doubts ("I don't think I could . . . .") as to her present willingness and ability to impose the death penalty. Such a construction coincides with the gist of the earlier portions of her *voir dire* examination in which she repeatedly assured the trial court that she had no "fixed opinion" as to what the penalty should be in this case, that she maintained an "open mind" as to that ultimate determination. Although we recognize that these assurances occurred in the context of an inquiry by the court into Mrs. Hope's exposure to pretrial publicity, we doubt that such assurances, even in this context, could have been given by a person who would "automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before [him]. . . ." (*Witherspoon* v. *Illinois, supra,* 391 U.S. at p. 522 & fn. 21 [20 L.Ed.2d at pp. 784-785].)

Finally, the Attorney General points to Mrs. Hope's next statement, ''I don't think I could put anyone in the—not necessarily in this case, but in any case—.'' The Attorney General argues that this statement constitutes an unequivocal declaration that the juror would never vote for the death penalty ''in any case.'' Such a reading stretches the comprehensibility of the statement. Indeed, the statement lacks meaning or significance because the trial court ''did not allow her to complete her replies, and her partial answers do not make it 'unmistakably clear' that she 'would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial. . . .' '' (*People* v. *Risenhoover, supra,* 70 Cal.2d 29, 56.) Indeed, the most that we may discern from this incomplete response is that Mrs. Hope's conscientious opinion concerning capital punishment would apply not only in the present case but ''in any case.'' We have no reason to believe, however, that Mrs. Hope would automatically vote against the imposition of capital punishment in any case.

Thus, we remain faced with the trial court's excusing Mrs. Hope because she stated that she could not follow ''the law.'' Yet in no instance did she ever receive an adequate explanation that ''the law'' placed the decision as to penalty within her absolute discretion, unguided and unlimited by rules of law, standards, or instructions. Under such cirumstances, *Witherspoon* and our own *Teale* and *Varnum* cases require that we reverse the judgment imposing the death penalty.

The writ is granted as to the penalty trial. The remittitur issued in *People* v. *Hillery,* Crim. 9801, is recalled and the judgment imposing the death penalty is reversed insofar as it relates to the penalty. In all other respects it is affirmed.

Traynor, C. J., Peters, J., Sullivan, J., and Molinari, J. pro tem.,* concurred.

BURKE, J.—I dissent. A review of the record reveals no error under *Witherspoon* v. *Illinois,* 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770].

The court initially, and counsel repeatedly thereafter, advised the veniremen that it would be the function of the jury to determine the penalty, namely, life imprisonment or death; that the jury would be called upon to make the decision from

---

*Assigned by the Chairman of the Judicial Council.

all the evidence "in its absolute discretion under the law, which the Court will give them."

The majority opinion asserts that the latter portion of the phrase used by the judge in his initial explanation to the veniremen obscured the fact that under the law theirs was an absolute discretion. One need only read the particular phrase in context to demonstrate that no confusion was created by the judge's reference to this traditional division of responsibilities between judge and jury.

It is customary for both the court and counsel to state repeatedly during a *voir dire* examination that the court will instruct the jury as to the law, referring to the formal instructions at the conclusion of the trial. That this is what the court referred to in the statement quoted above becomes very clear when read in context with the explanation which the judge had just finished giving the veniremen concerning their function: that "it is the duty of the Court upon the conclusion of the testimony to instruct the jury in the rules of law which apply to this case; it is the duty of the jury to follow those rules of law stated to them by the Court. . . . [T]he jury will be governed solely by the evidence introduced in the trial and under the law as stated to them by the Court."

It is entirely proper to consider the entire *voir dire* examination of the veniremen which preceded the examination of the juror asserted to have been improperly excused for whatever light such examination may shed upon the questions asked of this particular juror.

That it is our duty to consider the *voir dire* of individual jurors in context with the examination which preceded it has been plainly set forth in the recent unanimous decision in *People* v. *Varnum,* 70 Cal.2d 480, 492-493 [75 Cal.Rptr. 161, 450 P.2d 553].

Applying the rules of *Varnum* to the instant case, we find that the court and counsel by their painstaking *voir dire* examination and the court's rulings had made it unmistakably clear to the prospective jurors that the only such jurors who would be excused for cause by reason of their conscientious scruples or objections to the death penalty would be those who could not or would not agree to impose it under any circumstances. Those veniremen who expressed mere distaste for the death penalty were not excused.

Furthermore, applying the rules of *Varnum,* we note that the court made it quite clear that the decision as to what is a "proper case" is for the jury to determine:

Juror Mincy was advised in the questioning, as to whether she felt that under any circumstances she could impose the death penalty, that both the People and the defendant are ''entitled to the independent thinking of the twelve jurors. . . .'' A few typical examples of explanations given to other individual jurors follow:

(Juror Vierra) ''Mainly, what the law says that a person who has been convicted of first degree murder it is the duty of the jury to determine what the punishment or penalty should be, either life imprisonment or death. That is what the jury has to decide. . . . As just stated, a person who is found guilty of murder in the first degree is entitled to a choice of penalties as depending upon how the jurors view the matter. They are the ones that say what the penalty should be.

''A. Well, according to what I read—

''Q. We don't give everyone convicted of murder life imprisonment nor do we put everyone to death. It depends upon the facts of each case. . . . The Court ordinarily gives instructions after all the arguments of both sides are in and the case rests in the hands of the jury and they decide what the penalty should be based upon the evidence and the law. That is exactly the reason why we are asking these questions. I mean, you wouldn't be a fair and impartial juror if you have already made up your mind as to what the penalty should be, would you?''

(Juror Murphy) ''Now, the Court has not indicated what the penalty should be, certainly, that is within the province of the jurors in this particular case after you have heard all the evidence in this case and the jurors, as previously stated, are the sole judges of what the facts are based on the evidence; the Court will give them the rules of law to apply to the facts, and they will have to come up with a very, very weighty decision one way or the other; there is no middle ground, you see, either life imprisonment or the death penalty. The jury must decide one way or the other. . . . Let's be real frank about the matter. The Court, of course, is not expressing any opinion again relating one way or the other on the case, but suppose after you heard all of the evidence you felt that the death penalty was the proper penalty in this case, do you feel you could bring in a verdict for the death penalty or do you feel if you got to that point you would get cold chills and a fever, or something else, and you would say, 'Well, I just can't impose the death penalty even though I believe the facts would warrant it.' Is that your position, sir?

"A. Well, I would like to be excused.

"Q. Well, you are sort of quibbling a little bit. You don't feel you could impose the death penalty now regardless of what the facts and circumstances are, is that it?

"A. Yes."

(Juror Natali) "Well, we recognize, of course, that many people don't believe in the death penalty under any circumstances, but nevertheless, the law of California accepts the death penalty in a proper case. That is one of the big responsibilities jurors have in a murder case, when it comes to fixing the penalty and the jurors are the ones who fix it. The Court doesn't have a thing in the world to do with it. The juror[s] say whether it should be life or the death penalty. . . . Please bear in mind that the Court is not suggesting that this is a proper case for imposing the death penalty because we haven't even gone into the evidence yet."

(Juror Comfort) "[T]here is no burden of proof on the prosecution to prove that this man should die, or on the other hand that there is no burden of proof on the defendant that he should live. It is solely up to your discretion?"

(Juror Williams) "[T]hat our responsibility at this time is to decide whether he should receive a life sentence or death. And, in deciding that, you may exercise your absolute discretion, of course, based upon the instructions that the Court will give you. . . . Mr. Williams, do you think, distinguishing if you can the difference between the theory of rendering a verdict of death in a proper case, and actually participating, do you feel that you would be able to participate in a verdict of death if the evidence should show you it is a proper case?"

(Juror Rosa) "You understand, I hope, by asking these questions the Court is not insinuating at all, even intimating that this will be the proper penalty in this case, but—

"A. I understand.

"Q. — — if the jurors should find from the evidence that that is the proper penalty, what we want to know is if you would be able to impose that? Do you have any conscientious opinion or scruples against it in the proper case?

"A. No. . . .

"Q. The law says that there is a choice in the penalty of a first degree murder case, life or death; that it is the duty of the jurors to determine which it shall be. The jury determines the sentence, the Court has absolutely nothing to do with it. In a penalty case, the Court has no judgment, but the judgment on the penalty in a first degree murder case—

"A. Well, that is the way I feel about it.

"Q. I take it, then, you don't feel you could follow the law because you don't agree with the law?

"A. I don't really disbelieve it. I mean, I could if I—I wouldn't even be believing in it.

"Q. Well, you would be unqualified as a juror, Mrs. Rosa, or are you willing to accept the law as it exists—the Court had better excuse you, I am afraid, you wouldn't be very fair to the defendant in this case. The Court will excuse you."

(Juror Voss) "You understand that under the law of this state, the jurors have the choice, and not only the choice but the duty of deciding between the two possible punishments in a first degree murder case, one of life imprisonment or the death penalty. You understand that? . . . When it comes time to decide the case, will you take the rules of law which the Court gives you and apply them to whatever you find the facts to be, based upon the evidence?"

(Juror Hickey) "And, then again, I would like to emphasize as has been emphasized many times that the questions that I ask you, asked by the Court or the counsel are not to be construed as any implication on the part of either the Court or counsel as what the penalty should be in this matter. This matter is entirely within the discretion of the jury after they have heard all the evidence, have been instructed by the Court concerning the rules of the law. . . . And, when it comes to deciding the case, one way or the other, you understand that you only have two choices if you are accepted as a juror? You either find life imprisonment or the death penalty and would you take the rules of the law which the Court has given you and apply them to whatever you find the facts to be based upon the evidence? Will you do that for us sir?"

(Juror Wooten) "Now, you feel, as you sit there now, you could exercise your absolute discretion based upon the Court's instructions in rendering a verdict?"

The majority opinion states that jurors were advised that "our laws do provide for the death penalty in the proper case," and that this inferred some limitation, that would be forthcoming, upon the "absolute discretion" between penalties which they were also being told they would have. Again, a reference to the questioning in context dispels the possibility of any such confusion. For example, Juror Fernandes, the last to be examined before the examination of Juror Hope, was asked by the court: ". . . the jury has been called upon to decide whether the penalty should be life imprisonment or the death penalty? Do you understand that?

"A. Yes, sir.

"Q. There is no middle ground at all, it has to be one or the other?

"A. Yes.

"Q. Do you entertain such conscientious opinions as would preclude you from assessing the death penalty in the proper case?

"A. No, sir.

"Q. You are not opposed to the death penalty in the proper case then, is that correct, sir?

"A. That is right.

"Q. You understand our laws do provide for the death penalty in the proper case?

"A. Yes.

"Q. And, the reason why we ask that type of question is that the law also charges the jury with the very onerous duty of determining what the penalty should be in a first degree murder case, do you understand that?

"A. Yes, sir."

Only five prospective jurors were excused because of conscientious opinions which "would preclude them from assessing the death penalty in a proper case." Since the majority opinion finds fault only with the excusing of one of the five, Mrs. Hope, we may assume that it concludes the others were properly excused.

An examination of the questions asked of each of the five jurors excused because of conscientious objections to the imposition of the death penalty reflect that in every instance essentially the same test question was used: "Do you entertain such a conscientious opinion as would preclude you from assessing the death penalty in a proper case?" (This same question was repeated almost without exception to each of the other veniremen as well.) In addition, as to each of the four who were excused by the court prior to the examination of Mrs. Hope, the court supplemented the test question with questions such as:

(Juror Mincy) "Do you feel under any circumstances that you could impose the death penalty?"

(Juror McCullough) "You don't believe in the death penalty in any type of case?"

(Juror Murphy) "Well, are you trying to tell us, sir, that you don't believe in the death penalty under any circumstances? . . . Well, you are sort of quibbling a little bit. You

don't feel you could impose the death penalty now regardless of what the facts and circumstances are, is that it?

(Juror Thayer) "You have the feeling then that no matter how strong the facts and circumstances were, you just couldn't impose the death penalty if you felt it proper? A. I couldn't.''

Having in mind the many, many times before reaching Mrs. Hope that the court and counsel had stressed that the choice of penalty was in the absolute discretion of the individual jurors and the jury as a whole, I find it inconceivable that Juror Hope was under any misapprehension whatever as to what her duty would be if selected. She, too, was explicitly told by the court: ''You understand that we are interested in selecting a fair and impartial jury to determine what the penalty should be in the defendant's case?

"A. Yes, sir.

"Q. Either life in prison or death?

"A. Yes.

"Q. One or the other?

"A. Yes.

"Q. Depending upon how the jurors view the evidence and the law which will [be] given to them by the Court. . . . Was there anything about what you read or heard which left you with any fixed opinion or beliefs as to what the penalty should be in this case?

"A. No.

"Q. You are perfectly open minded at this time, is that right?

"A. Yes, sir.

"Q. You won't close your mind and determine what the penalty should be until after you have heard the testimony, heard the instructions so far as the rules of law are concerned, is that correct?

"A. No.

"Q. I mean, would you keep an open mind and wait to make up your mind until after you have heard the Court's instructions and all evidence?

"A. Yes, sir.

"Q. All right. You see, that is a requirement, of course. I take it, then, you have no opinion one way or the other as far as the penalty, life imprisonment or death, as you sit in the jury box, is that correct?

"A. Well, I don't think I could send anyone to death.

"Q. Well, that was the next question I was going to ask you. Do you entertain such a conscientious opinion as it

would preclude you from assessing the death penalty in a proper case?

"A. I don't think I could put anyone in the—not necessarily in this case, but in any case—

"Q. You understand, do you, that it is the law of California and it includes the death penalty?

"A. Yes.

"Q. There has been a lot of sparring, discussion, and debate about the matter, but it is on the statute books, it is still our law to be applied in a proper case, do you understand that?

"A. Yes, sir, I understand that.

"Q. I take it, from your response that even though that is the law you don't think you could follow the law, is that it?

"A. No, I don't think I could.

"Q. All right. Well, you are entitled to your conscientious beliefs, of course, and we don't quarrel with anyone who disagrees with our law, of course, but it disqualifies you to serve as a juror in this case. So, the Court will necessarily have to excuse you.

"A. Yes, sir."

Clearly, Mrs. Hope expressed her view that she could not "send anyone to death . . . not necessarily in this case, but in any case." Since she could not impose the death penalty in *any case* the court had absolutely no discretion whatever but to excuse her in full compliance with the subsequently announced rules of the *Witherspoon* decision of the United States Supreme Court.

Finding no error, I would affirm.

McComb, J., concurred.