Filed 1/29/15  P. v. DeAlba CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B249908 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA073050) |
| v. | |
| DANIEL DeALBA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, David B. Gelfound, Judge.  Affirmed.

Law Offices of James Koester, James Koester, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, William H. Shin, Deputy Attorney General, and Eric E. Reynolds, Deputy Attorney General, for Plaintiff and Respondent.

_____

The jury convicted defendant and appellant Daniel DeAlba of attempted murder (Pen. Code, §§ 187, subd. (a), 664, subd. (a) [count 1]),[1] criminal threats (§ 422, subd. (a) [count 2]), and assault with a deadly weapon (§ 245, subd. (a)(1) [count 3]).  It found true the special allegation that the attempted murder was willful, deliberate, and premeditated.

Defendant's oral motion for new trial was heard and denied.  The trial court sentenced defendant to life in prison in count 1, a concurrent term of two years in count 2, and a term of three years in count 3, which was stayed pursuant to section 654.

Defendant contends that there is insufficient evidence to support the jury's special allegation finding that he intended to kill the victim or that he acted willfully, deliberately, and with premeditation.  He further contends that the trial court erred in failing to instruct sua sponte on attempted voluntary manslaughter, and that his counsel was ineffective because she failed to ask for an attempted voluntary manslaughter instruction, failed to consult a voice recognition expert, promised to prove he was misidentified beyond a reasonable doubt in her opening statement, and failed to file a written motion for new trial.

We affirm the judgment.

## FACTS

*Prosecution*

In August 2011, defendant's son and Edward Aguilar were both arrested for a narcotics-related crime.  Both were convicted.  Aguilar served 270 days in jail, and defendant's son was sentenced to five years in prison.

---

[1] All further statutory references are to the Penal Code, unless otherwise specified.

At around 2:30 p.m. on March 3, 2012, Aguilar was riding a bicycle, and stopped at an intersection close to a car wash. Defendant walked toward Aguilar from the car wash. Defendant threw a punch which grazed Aguilar's face, knocking his sunglasses to the ground. Aguilar jumped behind a flower bed, out of defendant's reach. Defendant yelled at Aguilar and asked Aguilar what happened to his son. Aguilar said they were both arrested. Defendant responded, "I'm going to fucking kill you," and moved closer to Aguilar.

Aguilar got on his bike and rode away. He could hear defendant yelling behind him. When he was about 50 yards away, he heard tires screeching behind him. He turned and saw defendant driving the car, which was an old white sedan, possibly a 1990's Toyota Camry. Defendant turned into oncoming traffic to follow Aguilar. When Aguilar made a left turn, defendant continued to follow him. At one point defendant attempted to cut Aguilar off by making a U-turn.[2]

Aguilar rode on the sidewalk, pedaling as fast as he could. Defendant pulled the car alongside him. Aguilar then stopped abruptly, causing defendant to drive past him. Aguilar rode his bike into the street behind defendant's car. Defendant zigzagged to keep Aguilar from passing him. Aguilar rode up onto the sidewalk again. As he crossed a driveway, defendant abruptly turned into it, and drove onto the front lawn of a house in an attempt to hit Aguilar. Aguilar rode behind a tree to escape. Defendant's car missed him by inches.

Defendant backed up, and then drove toward Aguilar again. Aguilar feared for his life. He believed defendant was trying to kill him. Aguilar jumped off his bike and ran to the closest house. He could hear defendant revving the car's engine behind him. He banged on the front door of the house, yelling for someone to let him in, and call 911. He screamed that defendant was trying to run over him. Defendant pulled up to the house

---

[2] Defendant testified that a second car, a dark green sedan, followed him as well, but that the driver never drove close to him and did not try to hit him.

and ran toward Aguilar. Someone opened the door and pulled Aguilar inside, when defendant was only five feet away. Defendant's fist struck the door as it closed.

There was a woman inside the house, and some other people who ran out a side door to confront defendant. Aguilar could hear defendant screaming and yelling. After a time, defendant left. Aguilar left the house and went home.

On March 3, 2012, at around 2:30 p.m., Joe Meyer was standing in his driveway when he saw a man on a bicycle being pursued by a car. The man got off the bicycle and ran toward Meyer's front door. Meyer went into the house through a side door, and saw the man inside. He locked the front door and called 911. While on the phone with the 911 operator, he walked out to the front yard. A Hispanic man with a goatee was in the yard ranting and raving.[3] He looked like he was "in fight mode." Meyer saw a white sedan and a bluish-green sedan parked in front of his house.

In a recording of Meyer talking to the 911 operator, defendant could be heard in the background. He said he was going to "get that son of a bitch." "That fucker is a snitch. He snitched my son off. He smokes dope." "I don't want no problems with you guys. My son is behind bars because of that fucker. That dope head." Another voice can be heard saying: "Come on. Let's go." Defendant replied, "Alright. We'll see him. We'll see him. That lying son of a bitch."[4]

Maria Zepeda was sitting on her front porch when she saw a man on a bicycle being chased by two cars. One car was white and the other was a darker color. The man on the bicycle shouted, "Call the police." The cars followed the bicycle wherever it moved. She saw the man on the bicycle get off and run into a house. Zepeda could hear someone shouting something about his son.

---

[3] Meyer was unable to identify defendant as the man who was in his yard at trial. He said that defendant's hair was different than the man's. He described the man on his lawn as a Hispanic male, with longish slicked back hair, a moustache and a goatee. The man was between 40 and 50 years old.

[4] The recording of the 911 call was played for the jury. Aguilar and investigating Detective Doug Larkin identified the voice as defendant's.

Zapeda was shown a six-pack of photographs at trial. She picked out photo number 4, which was of defendant, because it "called out to her the most" as being related to the incident. She could not positively identify defendant as one of the persons she saw driving either of the cars, but she believed that defendant was the person in the photo. She had not seen the drivers of the cars for more than five seconds.

Detective Doug Larkin investigated the incident. He observed a green 1990's Honda Accord parked on the street near defendant's house. Defendant told Detective Larkin the car belonged to him. Detective Larkin asked defendant if he had been in the area of the incident on March 3, 2012. Defendant said he had never been there in his life. Detective Larkin asked why Aguilar would say defendant tried to run over him with a car. Defendant said he had seen his son's arrest report and knew that Aguilar had "snitched" on his son. He was angry because Aguilar had received a shorter sentence than his son. Defendant said that as long as they were out of jail, Aguilar did not have to worry about him. He asked if Aguilar was injured. Detective Larkin said that he was not. Defendant smirked and replied, "Exactly."

*Defense*

Defendant had a business buying cars, restoring them, and then selling them for profit. He specialized in classic cars and Hondas. He sometimes kept cars he had for sale at his house.

Defendant's daughter, Priscilla DeAlba, worked at defendant's car restoration business. On March 3, 2012, at around 2:00 p.m. or 3:00 p.m., defendant picked up Priscilla at her house to get parts for a white 1992 two-door Honda Accord. They drove to an auto parts store together in defendant's blue Ford Ranger pickup truck. Defendant went inside while Priscilla waited in the truck. He stayed in the store for 30 to 45 minutes and afterwards drove Priscilla home.

Priscilla made a list of the cars the business owned in March 2012. The list included a 1998 blue Ford Ranger, a 1998 dark green Honda Civic, a 1992 white Honda

5

Accord, a 1997 burgundy Cadillac, a 2005 white Chevrolet Silverado, and a 1991 faded dark green Honda Accord.

Priscilla owned the green Honda Civic Detective Larkin saw parked in front of defendant's house. She let her older brother drive the car, but no one else.

Torina DeAlba, who was also defendant's daughter, worked at his business as well. She was out of the country on March 3, 2012, but returned about one or two weeks later. No one in the family had ever owned a Toyota.

Priscilla and Torina both testified that the voice in the background of the 911 call did not sound like defendant's voice. The person on the recording had a different accent. Defendant could not shout like the person on the recording, because he lost his voice when he yelled.

## DISCUSSION

*Sufficiency of the Evidence*

Defendant contends that his conviction for attempted premeditated murder must be reversed because there was insufficient evidence that he intended to kill Aguilar or that his acts were deliberate, willful, and premeditated. There is no merit to his claims.

The Fifth and Sixth Amendments, which apply to the states through the Fourteenth Amendment, require the prosecution to prove all elements of a crime beyond a reasonable doubt. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 277-278.) A conviction supported by insufficient evidence violates the Due Process Clause of the Fourteenth Amendment and must be reversed. (*Jackson v. Virginia* (1979) 443 U.S. 307, 317-319.) The same is true of enhancements. (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the

6

defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 701.) "We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence. [Citation.]" (*People v. Medina* (2009) 46 Cal.4th 913, 919.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*).) "Substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom." (*People v. Ugalino* (2009) 174 Cal.App.4th 1060, 1064.) "We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' [Citation]." (*Zamudio, supra,* at p. 357.) "The standard of review is the same when the prosecution relies mainly on circumstantial evidence. [Citation.]" (*People v. Valdez* (2004) 32 Cal.4th 73, 104.)

**Intent to Kill**

"'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citations.]" (*People v. Smith* (2005) 37 Cal.4th 733, 739.) It follows that to support a conviction with a surviving victim, the prosecution must prove defendant "acted with specific intent to kill that victim." (*Ibid.*) Reasonable inferences drawn from circumstantial evidence such as motive and the nature of the defendant's acts may support a finding of specific intent to kill. (*Id.* at pp. 740-741.) Intent to kill "may in many cases be inferred from the defendant's acts and the circumstances of the crime. [Citation.] 'There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions. [Citation.]'" (*Id.* at p. 741.)

Defendant argues he had many opportunities to run over Aguilar and did not do so, which evidences that he lacked the specific intent to kill. Without debating the merits of the dubious theory raised by defendant, there is substantial evidence in the record that

7

defendant repeatedly attempted to take Aguilar's life, and simply failed. Defendant's actions are substantial evidence of an intent to kill. Defendant immediately tried to punch Aguilar and told him in no uncertain terms that he intended to kill him. He barely missed Aguilar's head, knocking his glasses from his face. After Aguilar was able to get away, defendant chased Aguilar in his car, going so far as to drive into oncoming traffic in his pursuit. When Aguilar rode his bicycle on the sidewalk to evade defendant, defendant turned into a residential driveway and up onto a front lawn in an attempt to hit him. Aguilar rode behind a tree and escaped being run over by inches. When Aguilar then ran to the front door of a house and banged on the door to get inside, defendant pursued him on foot. He was only five feet away when Aguilar was pulled into the house and the door was locked behind him. Once Aguilar was inside, defendant continued to rant and rave like a man "in fight mode." Substantial evidence was presented that defendant had a strong motive to kill Aguilar. He believed that Aguilar bargained for a more lenient sentence at the expense of his son, who received a longer prison term. He told Aguilar that he believed he had snitched, and yelled about the snitching in front of other witnesses. His rants were recorded on the 911 call. In light of defendant's express threat, motive, and repeated violent actions, there was more than ample evidence for the jury to infer that defendant intended to kill Aguilar, and took direct, but ineffective, steps to do so.

### Willful, Deliberate, Premeditated Attempted Murder

Defendant argues that there is insufficient evidence of premeditation and deliberation because no evidence was presented of planning or preconceived design, two of the three factors that may support deliberateness and premeditation that were identified in *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*). He asserts the evidence shows he ran into Aguilar randomly at the car wash, and then impulsively used his car—which was the most readily accessible weapon—to assault Aguilar. We conclude the evidence was sufficient to support the jury's premeditation finding.

8

"An intentional killing is premeditated and deliberate if it occurred as the result of reflection rather than unconsidered or rash impulse. [Citations.] However, the requisite reflection need not span a specific or extended period of time. Thoughts may follow each other with great rapidity, and cold, calculated judgment may be arrived at quickly. [Citations.]" (*People v. Nelson* (2011) 51 Cal.4th 198, 213 (*Nelson*).) "The test is not time, but reflection." (*People v. Bloyd* (1987) 43 Cal.3d 333, 348.)

*Anderson*, *supra*, 70 Cal.2d at pages 26-27, identified three factors that may support a finding of premeditation and deliberation—planning, motive, and preconceived design. But these factors are not the only means for establishing premeditation and deliberation. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1127.) "Unreflective reliance on *Anderson* for a definition of premeditation is inappropriate." (*People v. Thomas* (1992) 2 Cal.4th 489, 517.) The court's ultimate duty is to assess "'whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.' [Citation.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 812.) "A conviction will be upheld on any reasonable theory supported by substantial evidence. [Citations.]" (*Nelson*, *supra*, 51 Cal.4th at p. 213.)

As discussed above, the evidence shows that defendant had a motive to kill Aguilar. Evidence was also presented that defendant had time to weigh his options and make a considered decision. He sought out Aguilar, approaching him from the nearby car wash. He was not in his car when he first encountered Aguilar. He made the decision to enter the car and pursue Aguilar aggressively. Defendant's actions were deliberate. The jury could reasonably infer defendant was intent on killing Aguilar and that he had made the decision to do so before the altercation. There were several occasions during the incident for defendant to weigh the consequences of his actions and proceed with a determination to exact fatal revenge. Defendant made a U-turn in attempting to cut Aguilar off; mirrored Aguilar's movements, zigzagging to stay close behind him; drove into oncoming traffic to prevent Aguilar from escaping; and then tried to cut Aguilar off again by driving over a curb into Meyer's front yard. He got out of the car and continued

9

to chase Aguilar.  All of his actions required a degree of forethought and decision-making, which he had sufficient time to consider.

Finally, there was no evidence that Aguilar did anything to provoke an impulsive violent response from defendant during the encounter, which lends further support to the jury's finding that the attempted killing was deliberate and premeditated.  (See *People v. Lunafelix* (1985) 168 Cal.App.3d 97, 102 [lack of provocation is a strong factor supporting jury's conclusion that defendant's attack was deliberate and premeditated].)  The evidence was sufficient to sustain defendant's conviction for willful, deliberate, premeditated attempted murder.

*Attempted Voluntary Manslaughter Instruction*

The trial court instructed the jury as to attempted murder, and deliberation and premeditation.  It did not instruct the jury as to attempted voluntary manslaughter on a heat of passion theory.  The jury convicted defendant of attempted premeditated murder.  Defendant contends on appeal that the trial court had a sua sponte duty to instruct the jury as to the lesser included offense of attempted voluntary manslaughter.[5]  He argues that he acted in the heat of passion, because the initial provocation—learning that defendant had snitched on his son—was an ongoing source of irritation, and upon seeing Aguilar unexpectedly he became so incensed about his son's sentence that he acted irrationally.  We reject defendant's contention.

The Constitution requires the jury to determine every material issue presented by the evidence.  (*People v. Lewis* (2001) 25 Cal.4th 610, 645 (*Lewis*).)  Accordingly, "[a] court must instruct sua sponte on general principles of law that are closely and openly connected with the facts presented at trial."  (*People v. Lopez* (1998) 19 Cal.4th 282, 287.)  "[A] trial court must instruct on lesser included offenses, even in the absence of a

---

[5] Defense counsel did not request an attempted voluntary manslaughter instruction.

10

request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged offense are present." (*Lewis*, *supra*, at p. 645.) "[S]ubstantial evidence to support instructions on a lesser included offense may exist even in the face of inconsistencies presented by the defense itself." (*People v. Breverman* (1998) 19 Cal.4th 142, 162-163 (*Breverman*), fn. omitted.) "Conversely, even on request, a trial judge has no duty to instruct on any lesser offense *unless* there is substantial evidence to support such instruction. [Citation.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1008.) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense . . . ." (*Breverman*, *supra*, at p. 162.) Evidence is substantial for this purpose if it could cause a jury composed of reasonable persons to conclude that the defendant committed the lesser but not the greater offense. (*Ibid*.)

Our Supreme Court has held that "in a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*People v.*] *Watson* [(1956) 46 Cal.2d 818, 836]. A conviction of the charged offense may be reversed in consequence of this form of error only if, 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred [citation]." (*Breverman*, *supra*, 19 Cal.4th at p. 178, fn. omitted; but see *People v. Thomas* (2013) 218 Cal.App.4th 630, 643-644 (*Thomas*) [applying *Chapman v. California* (1967) 386 U.S. 18 to a trial court's failure to instruct on the lesser included offense of voluntary manslaughter based on a heat of passion theory where supported by substantial evidence].) We, of course, follow the decision in *Breverman* and not *Thomas*.

Attempted voluntary manslaughter is a lesser included offense of attempted murder. (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708 (*Gutierrez*).) Either imperfect self-defense or heat of passion will reduce an attempted killing from attempted murder to attempted voluntary manslaughter by negating the element of malice. (*Ibid*.)

To establish attempted voluntary manslaughter under a heat of passion theory, the defendant must demonstrate both provocation and heat of passion. (*Gutierrez*, *supra*, 112

Cal.App.4th at pp. 708-709.) "'First, the provocation which incites the [perpetrator] to act in the heat of passion case must be caused by the victim or reasonably believed by the accused to have been engaged in by the [victim]. [Citations.] Second, . . . the provocation must be such as to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.' (*People v. Lujan* (2001) 92 Cal.App.4th 1389, 1411-1412.)" (*Gutierrez, supra*, at pp. 708-709.) "The test of adequate provocation is an objective one . . . . The provocation must be such that an average . . . person would be so inflamed that he or she would lose reason and judgment. Adequate provocation and heat of passion must be affirmatively demonstrated." (*People v. Lee* (1999) 20 Cal.4th 47, 60, citing *People v. Sedeno* (1974) 10 Cal.3d 703, 719; *People v. Williams* (1969) 71 Cal.2d 614, 624.) "'"[N]o specific type of provocation [is] required . . . ."'" [Citations.] Moreover, the passion aroused need not be anger or rage, but can be any "'"[v]iolent, intense, high-wrought or enthusiastic emotion'"" [citations] other than revenge [citation]. 'However, if sufficient time has elapsed between the provocation and the [crime] for passion to subside and reason to return, the [attempted] killing is not [attempted] voluntary manslaughter . . . .' [Citation.]" (*Breverman, supra*, 19 Cal.4th at p. 163.)

Here, the trial court had no duty to instruct on attempted voluntary manslaughter because there was not substantial evidence to support the instruction. No evidence was presented that Aguilar did anything to provoke defendant at any time on the day of the incident. Thus, contrary to defendant's assertions, there were no facts for the jury to weigh to determine whether defendant had been provoked that day. Moreover, defendant presented no evidence regarding when he first learned that Aguilar purportedly snitched on his son, which would allow the jury to evaluate whether the purported provocation was close enough in time for defendant to have remained unreasonably impassioned. Defendant argues that the jury could have inferred from the circumstances that defendant had learned of the snitching very recently. This is pure speculation; speculation is not substantial evidence. Without an affirmative showing of adequate provocation, the

12

evidence was legally insufficient for the jury to convict defendant of the lesser offense. The trial court did not err in omitting the instruction.

Regardless, any error in failing to instruct the jury as to the lesser included offense of attempted voluntary manslaughter on a heat of passion theory would be harmless in light of the jury's verdict finding defendant guilty of deliberate and premeditated attempted murder. This special finding is inconsistent with a heat of passion theory. The factual question that would have been posed by heat of passion/attempted voluntary manslaughter instructions was resolved adversely to defendant by the jury. (Cf. *People v. Prettyman* (1996) 14 Cal.4th 248, 276.) In addition, the jury was not confronted with an all or nothing choice, i.e., guilty of attempted premeditated murder or not guilty. (Cf. *People v. Turner* (1990) 50 Cal.3d 668, 692-693.) It was given an opportunity to find defendant guilty of attempted murder without premeditation and deliberation or of the lesser related offense of assault with a deadly weapon under section 245 alone, as charged in count 3.

Additionally, the evidence of defendant's guilt was overwhelming. Defendant was identified as the assailant by Aguilar, who knew him prior to the incident and was not likely to misidentify him. Zepeda also indicated a belief that defendant was one of the drivers, although her identification did not have the same degree of certainty. Defendant had a strong motive to commit the crimes because of Aguilar's relationship to his son's imprisonment. The assailant referenced his son and a "snitch" vehemently multiple times during the incident, most notably on the 911 recording. Zapeda heard the assailant yelling about his son, consistent with defendant's motive. Finally, both Aguilar and Detective Larkin positively identified defendant's voice as being in the background in the 911 recording. There is no reasonable probability the asserted error contributed to the verdict.

13

*Ineffective Assistance of Counsel*

Defendant contends that the aggregate of defense counsel's errors deprived him of his right to the effective assistance of counsel, as required by due process. Specifically, he argues that counsel's performance was ineffective because she: (1) failed to request an instruction on attempted voluntary manslaughter or a pinpoint instruction on provocation; (2) was deficient in securing and preparing a voice recognition expert; (3) promised that she would show defendant was not the perpetrator beyond a reasonable doubt in her opening statement; and (4) failed to file a written new trial motion. We reject defendant's arguments.

"To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-694; see *Williams v. Taylor* (2000) 529 U.S. 362, 391-394; *People v. Kraft* (2000) 23 Cal.4th 978, 1068.) 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694; *People v. Riel* (2000) 22 Cal.4th 1153, 1175.)" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003.) Prejudice may be shown when, although no single error was prejudicial in and of itself, the cumulative effect of counsel's errors so undermined confidence in the outcome of the trial that the reviewing court could not be confident in the outcome. (*In re Jones* (1996) 13 Cal.4th 552, 583-587.) If a court may dispose of the case on lack of prejudice, there is no need to consider error. (*Strickland v. Washington*, *supra*, at p. 699.)

To establish the first prong, "defendant must show that counsel's action or inaction was not a reasonable tactical choice . . . ." (*People v. Michaels* (2002) 28 Cal.4th 486, 526.) Deference is generally afforded to the tactical decisions of trial

14

counsel in order to avoid second-guessing counsel's tactics. (*In re Jones*, *supra*, 13 Cal.4th at p. 561; *In re Cordero* (1988) 46 Cal.3d 161, 180.) Ineffective assistance of counsel claims are generally more appropriately litigated through habeas corpus proceedings, as they frequently involve questions of defense strategy that do not appear on the face of the trial record. (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.) "If the record 'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' (*People v. Pope* (1979) 23 Cal.3d 412, 426; see *In re Avena* (1996) 12 Cal.4th 694, 721.)" (*People v. Ledesma* (2006) 39 Cal.4th 641, 746.)

**Failure to Request an Attempted Voluntary Manslaughter Instruction**

As we discussed, in this case there was not substantial evidence to support giving an instruction on attempted voluntary manslaughter on a heat of passion theory because defendant did not present substantial evidence of provocation. Our conclusion that there was not substantial evidence of provocation necessarily forecloses any argument that a pinpoint instruction on provocation would have been appropriate. Absent substantial evidence to support either instruction, counsel made a reasonable tactical choice in not requesting them, and defendant was not prejudiced by their omission.

**Deficiencies in Securing and Preparing a Voice Recognition Expert**

During trial, defense counsel sought to offer the testimony of Thomas Guzman-Sanchez as an expert witness on voice recognition. Guzman-Sanchez would testify that in his opinion the voice in the background of the 911 telephone recording was not defendant's. The trial court held a hearing pursuant to Evidence Code section 402 to determine whether the testimony was admissible.

Guzman-Sanchez testified at length in the hearing. He was a member of the Los Angeles Superior Court Expert Witness Panel; had over 30 years of experience as an Avid Editor and Final Cut Professional for television and film; produced, mastered and engineered albums; and did extensive nonlinear editing, i.e. moving clips of audio from one point in a file to another using a computerized process. Guzman-Sanchez had developed a heightened ability to recognize accents, cadence, timbre, rhythm, tone, pattern, and other components of voice and speech through his work. He used all of the most current technology and state of the art equipment for editing audio. Guzman-Sanchez had consulted on voice identification for public defenders in 16 cases, and testified in 1 case.

In determining whether the voice was defendant's, Guzman-Sanchez created an exemplar, by recording defendant's voice as he a experienced a range of emotions. He then converted the exemplar and the 911 telephone recordings into the same file type to balance the volume and resolution of the files for comparison, and removed all extraneous noise from the 911 telephone recording. He isolated the background voice from the 911 telephone recording and consolidated it into one file with the exemplar so that he could evaluate them back-to-back. It was very clear to him from the rhythm and timbre of the voices that they were not the same person.

Guzman-Sanchez confirmed that defense counsel contacted him two weeks prior to the hearing to check his availability, and that the day before the hearing she had asked him whether he was ready to testify despite the short timeline.

On cross-examination, Guzman-Sanchez testified that he did not have an educational degree in Linguistics, Forensics, Anthropology and Dialects, or any other subject related to performing auditory voice comparison. Guzman-Sanchez testified that no such discipline existed. He could read a sound wave graph, but a sound wave alone would not allow someone to differentiate between two voices. He reached his conclusions through listening. Guzman-Sanchez had not written any scholarly articles related to voice comparisons. He had read dozens of articles but could not recall the authors.

16

On redirect, Guzman-Sanchez testified that in listening to a voice he could isolate many different factors to compare, and that in addition to listening, he used tools such as sound waves to support his conclusions. He spent 20 hours analyzing the audio in the case, consisting of 17 hours of laboratory analysis, and 3 hours converting files and making a report.

The prosecution argued that although Guzman-Sanchez appeared to be very experienced in sound editing, his experience with listening would not be any different from that of a juror of the same age, and was simply a lay opinion. Guzman-Sanchez's opinion was not based on any recognized scientific method. He therefore could not testify as an expert on that aspect of the 911 telephone recording, and allowing him to testify would create confusion in the jury regarding whether he was giving lay testimony or an expert opinion.

After a recess, the court ruled the testimony excluded. It concluded that Guzman-Sanchez's testimony lacked foundation, was based on speculation and conjecture, and would cause confusion to the jury. The court stated that it would be admissible to have someone who was familiar with defendant's voice testify as to whether the voice on the 911 telephone recording was defendant's.

Defendant contends that his counsel's failure to secure a voice recognition expert within a reasonable time, and to adequately prepare the proposed voice recognition expert by timely supplying discovery to him, constitutes ineffective assistance. We disagree, because defendant has not demonstrated prejudice.

Defendant argues that his main defense at trial was mistaken identification, and that if the jurors believed Guzman-Sanchez's expert testimony, along with the testimony of defendant's alibi witness, it would have likely created reasonable doubt that he was the assailant. But defendant does not explain how extended or more timely preparation would have affected the trial court's ruling. The question at issue was whether Guzman-Sanchez had specialized experience and education that would qualify him to audibly distinguish between two voice recordings in a more accurate manner than the average layperson. Although he demonstrated extensive knowledge and experience in audio

17

editing, he had no scientific educational background and had written no academic articles in the area of voice comparison. The trial court based its ruling on his lack of these qualifications, and defendant does not challenge the trial court's ruling on appeal. Defendant has not argued that Guzman-Sanchez had specific additional qualifications that the court may have accepted. There is no basis to believe that the outcome of the Evidence Code section 402 hearing would have been different if Guzman-Sanchez had prepared earlier.

Moreover, defendant introduced other evidence to refute the prosecution's argument that his voice was in the background of the 911 telephone call. Defendant's two daughters testified that the background voice was not his. Our Supreme Court has long recognized that lay witness testimony is appropriate to identify a defendant's voice. (See *People v. Clark* (1992) 3 Cal.4th 41, 135-137; *People v. Osuna* (1969) 70 Cal.2d 759, 764-765.) The jury had the opportunity to consider their testimony, and rejected it.

Finally, the prosecution's evidence that defendant was the assailant was overwhelming. He had a strong motive, which he referred to repeatedly in front of witnesses, and he was identified visually as well as audibly. Neither the extent nor timing of Guzman-Sanchez's preparation is sufficient to undermine confidence in the outcome.

**Opening Statement Promise**

In her opening statement, defense counsel told the jury: "The evidence will prove to you -- if you don't mind my saying, beyond a reasonable doubt—that it couldn't have been [defendant]. [¶] And when I say the evidence will prove it, I want you to hold me to that. We'll have witnesses. We'll have the people who know the true facts and we'll bring them before you to testify."

Defendant argues that counsel unreasonably made this promise to the jury although she could not keep it. He asserts that the proposed expert witness was the

18

lynchpin of her theory, but that she had not yet given discovery to him to analyze and did not have adequate knowledge of his qualifications to make her promise. Although the argument is not fully developed, it appears that defendant also contests the statement on the basis that it improperly shifted the burden of proof to the defense.

Defendant's assertion that there was no evidence to support the statement is belied by the record. Defense counsel did not promise the jury that she would present expert testimony on voice recognition. She *did* present evidence that defendant was not the assailant as promised—witnesses who testified that the voice in the background of the 911 telephone recording was not defendant's, an alibi witness, and evidence that defendant did not have access to a car that matched the description of the assailant's vehicle—all of which supported her theory of the case. It was not an unreasonable choice to argue mistaken identity as a defense.

With respect to the burden of proof, counsel's statement that she could prove defendant was not the assailant beyond a reasonable doubt was qualified, and suggested that even if the burden was shifted she could prove his innocence. We do not interpret it as a statement that the burden of proof fell to defendant. Defense counsel may have made the statement in an attempt to make defendant's case appear stronger before the jury. The record is not adequately developed for us to discern counsel's tactical motivations, and this is not a case where there was no reasonable explanation for her actions.

Even if counsel's statement was unreasonable, we cannot conclude that defendant was prejudiced. As we have discussed, the evidence of defendant's guilt was overwhelming. Additionally, it is highly unlikely that the jury interpreted counsel's statement to mean anything other than that she was very confident in the evidence. Even if it did, it was properly instructed on the burden of proof pursuant to CALCRIM No. 220, and instructed under CALCRIM No. 200 that to the extent the attorney's comments on the law conflicted with the court's, they were bound to follow the court's instructions. Jurors are presumed to be intelligent and capable of correctly understanding the court's

19

instructions.  (*People v. Lewis* (2001) 26 Cal.4th 334, 390; *People v. Sanchez* (2001) 26 Cal.4th 834, 852.)  We presume they did so here.

### Failure to File a Written Motion for New Trial

Finally, defendant was not prejudiced by counsel's failure to file a written motion for new trial.  Defense counsel presented the motion for new trial orally at length, arguing that the trial court improperly excluded Guzman-Sanchez's expert testimony, that defendant's jury trial rights were violated because one of the jurors recognized the victim as someone who he had seen in his neighborhood, and that the charge in count 3 had been improperly added just prior to trial constituting double jeopardy.  As defendant admits, he "can only speculate as to whether counsel would have made a better argument through a written motion."  Such speculation does not undermine our confidence in the outcome of the trial.

### *Cumulative Error*

Defendant contends that even if no single error warrants reversal of the judgment, the errors must be deemed prejudicial when evaluated in combination.  We reject the claim.  Any errors at trial as a whole were of minimal significance.  In light of that and the overwhelming evidence of guilt in this case, whether considered individually or for their cumulative effect, they could not have affected the process or result to defendant's detriment.

## DISPOSITION

The judgment is affirmed.

KRIEGLER, J.

We concur:

TURNER, P. J.

GOODMAN, J.*

---

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.